IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GENE VELA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| THE CITY OF AUSTIN, TEXAS; | § | |
| SERGEANT ANDREW WESTBROOK; | § | 1:15-CV-1015-RP |
| OFFICER ADRIEN CHOPIN; OFFICER | § | |
| LEONARDO CARDENAS; OFFICER | § | |
| JOSEPH POSWALK; OFFICER RYAN | § | |
| HANCOCK; OFFICER JOHN RICKER; | § | |
| DETECTIVE CHRISTOPHER VETRANO; | § | |
| and OFFICER CHRISTOPHER BARTSCH; | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is a motion for summary judgment filed by Defendants Adrien Chopin and Leonardo Cardenas.[1] (Dkt. 46). Having considered the parties' arguments, the entire record, and the relevant law, the Court finds that the motion should be granted.

## I. BACKGROUND

This case concerns a man who was shot by police officers in his apartment. The basic facts are undisputed. On November 10, 2013, Andrew Clark ("Clark") called 911 to report that his friend, Plaintiff Gene Vela ("Vela"), had called him in a state of distress asking for help. Austin Police Department ("APD") officers arrived at Vela's apartment to conduct a welfare check, and Vela was seen holding a handgun and a laser sight. A thirty-minute standoff ensued, which ended after two officers, Adrien Chopin ("Chopin") and Leonardo Cardenas ("Cardenas"), shot Vela three times.

---

[1] The other named defendants in this action also moved for summary judgment. (*See* Dkts. 45, 46). Vela, however, dismissed his claims against the City of Austin, Sergeant Andrew Westbrook, Officer Joseph Poswalk, Officer Ryan Hancock, Officer John Ricker, Detective Christopher Vetrano, and Officer Christopher Bartsch. (Dkt. 54). Only Vela's claims against Officers Adrien Chopin and Leonardo Cardenas remain.

1

The dispute in this case concerns whether Chopin and Cardenas (collectively the "Officers") are liable for Vela's injury. The Officers contend that they fired at Vela because they believed he was a threat to the other officers—Vela repeatedly pointed his handgun and laser sight at the officers on the scene. (Mot., Dkt. 46, at 7, 10). Vela says that he was not adequately informed that police were outside his apartment, and he disputes that he ever held his gun in a threatening manner. (Resp., Dkt. 47, at 10–11).

Vela sued the officers who conducted the welfare check, the City of Austin, and the detective responsible for investigating his case. The Court dismissed Vela's state law claims, (Order, Dkt. 10), and Vela dismissed his claim under 42 U.S.C. § 1983 ("Section 1983") against the City, the detective, and several of the officer defendants. (Dkt. 54). The only remaining claim is Vela's cause of action under Section 1983 against Chopin and Cardenas for violating his Fourth Amendment right to be free of excessive force. (Compl., Dkt. 1, at 8–9). The Officers now move for summary judgment arguing that the use of force was reasonable and not clearly excessive, and that they are entitled to qualified immunity. (Mot., Dkt. 46, at 1–2).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Even when considering a qualified immunity defense, however, the Court must view the evidence in the light most favorable to the nonmovant and draw all inferences in the non-movant's favor, *Rosado v. Deters*, 5 F.3d 119, 122–23 (5th Cir. 1993), and cannot make credibility determinations or weigh the evidence, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). That said, when one party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

3

## III. SUMMARY JUDGMENT EVIDENCE

Viewed in the light most favorable to Vela, the summary judgment evidence is as follows. APD officers Ryan Hancock, Joseph Poswalk, and Christopher Bartsch were dispatched to Vela's apartment at 2900 Cole Street for a "check welfare urgent" call. (Mot., Dkt. 46, at 2; Resp., Dkt. 47, at 2). Hancock, Poswalk, and Bartsch arrived shortly before 9:30 p.m., and Sergeant Andrew Westbrook subsequently arrived with two medics from Austin/Travis County EMS. (Westbrook Aff., Dkt. 46-1, at 69; Bartsch Statement, Dkt. 46-1, at 4; DMAV Ricker, Dkt. 46-1, Exh. 18, at 0:30). Hancock, Bartsch, and Westbrook were all advised that Vela had a history with the APD and that he might be emotionally disturbed. (Westbrook Aff., Dkt. 46-1, at 69).

The four officers proceeded to Vela's apartment on the second floor and knocked on the sliding glass door to his apartment, but no one answered. (Bartsch Statement, Dkt. 46-1, at 4–5; Hancock Aff., Dkt. 46-1, at 9). The blinds to the sliding glass door were open, and officers saw that the lights in the living room and kitchen were on and the TV was on. (Bartsch Statement, Dkt. 46-1, at 4–5; Hancock Aff., Dkt. 46-1, at 9). They continued to knock, but the knocks were met with no response. (Bartsch Statement, Dkt. 46-1, at 4–5; Hancock Aff., Dkt. 46-1, at 9). One of the officers then requested the APD dispatcher to attempt to call Vela's phone number that Clark provided on the 911 call. (Bartsch Statement, Dkt. 46-1, at 5).

Meanwhile, Vela was alone in his bedroom. (Vela Dep., Dkt. 50, Exh. 3, at 48). Upon hearing the knocks, Vela was "startled." (*Id.* at 52). It was then that Vela received a phone call:

> **MR. VELA:** Who is this?
> **DISPATCHER:** Hi. This is Harmony with the Austin Police Department. Can I speak to Gene?
> **MR. VELA:** Yes, ma'am.
> **DISPATCHER:** Can I –
> **MR. VELA:** Speaking.
> **DISPATCHER:** Is this Gene? Hello?
> **MR. VELA:** Speaking.
> **DISPATCHER:** Yes. Is this Gene?
> **MR. VELA:** This is Gene.

4

> **DISPATCHER:** Okay. Are you at home right now?
> **MR. VELA:** Yes, ma'am.
> **DISPATCHER:** Okay. Is that 2900 Cole, number 204? Because I have officers there to check on, check on you, and they're saying there's no answer at the door. Apparently, one of your friends called us and wanted us to make sure you got home okay and that you're all right?
> **MR. VELA:** Where they at?
> **DISPATCHER:** The unit is on Cole Street. He's (crosstalk)—
> **MR. VELA:** Where are they at? Where are you guys? You guys are coming to get me. You guys are coming to get me. Fuck you.
> **DISPATCHER:** Hey, hey, hey. Hello? Hello? Hello? Sir? Sir? I've got an open line. He, he was talking to me, and when I asked him to open the door, that his friend wanted to make sure that he got home okay and to check . . . .

(APD Call Recording, Dkt. 46-1, Exh. 4; *See also* Vela Dep., Dkt. 46-1, at 23–24).

At that time, another officer, John Ricker, was looking into Vela's apartment through the sliding glass door and saw Vela step out from the bedroom holding a black handgun. (Ricker Aff., Dkt. 46-1, at 37). The officers yelled to each other that Vela had a gun and quickly sought cover. (Westbrook Aff., Dkt. 46-1, at 71; DMAV Ricker, Exh. 18, Dkt. 46-1, at 2:26). A standoff ensued for approximately the next thirty-five minutes. (DMAV Ricker, Exh. 18, Dkt. 46-1, at 2:26–39:19).

Vela began to ruffle the blinds and slammed the door to his apartment. Vela also shined the laser sight out of his apartment through the sliding glass doors. (Vela Dep., Dkt. 46-1, at 27–29). The officers could see a red laser shine through the glass door to Vela's apartment. (*See* DMAV Westbrook, Exh. 17, Dkt. 46-1, at 13:50). Some officers saw the laser pass over Officer Westbrook's body multiple times. (Poswalk Statement, Dkt. 46-1, at 94). Westbrook saw the laser shine on his chest before it moved to his arm and the wall behind him. (Westbrook Statement, Dkt. 46-1, at 60). Bartsch saw the laser sweep across the second floor walkway. (Bartsch Statement, Dkt. 46-1, at 5). Hancock saw the laser on the walls outside Vela's apartment. (Hancock Aff., Dkt. 46-1, at 9–10). The officers at the scene radioed that Vela had a laser sight on his pistol and requested SWAT. (DMAV Westbrook, Exh. 17, at 5:50; DMAV Ricker, Dkt. 46-1, Exh. 18, at 5:25). The dispatch operator called Clark and told him that Vela had a gun with a laser sight pointed at officers, and

Clark reported that Vela could be suffering from PTSD. (Dispatch Call, Dkt. 46-1, Exh. 4). The dispatch operator relayed to the officers at the scene that Vela was a veteran who was potentially suffering from PTSD. (DMAV Ricker, Exh. 18, Dkt. 46-1, at 8:23).

Chopin and Cardenas arrived shortly after hearing on the radio that officers at the scene had seen Vela with a gun and laser sight. (Chopin Aff., Dkt. 46-1, at 127; Cardenas Aff., Dkt. 46-1, at 149–50). Equipped with AR-15 rifles, Chopin and Cardenas positioned themselves behind a parked car and aimed their rifles at Vela's apartment. (Chopin Aff., Dkt. 46-1, at 127; Cardenas Aff., Dkt. 46-1, at 149–50; DMAV Westbrook, Exh. 17, Dkt. 46-1, at 8:40). Chopin and Cardenas saw the laser pointing out of the glass door and across the street. (Chopin Aff. Dkt. 46-1, at 128–34; Cardenas Aff., Dkt. 46-1, at 154–56; *see also* DMAV Westbrook, Exh. 17, Dkt. 46-1, at 13:50). Scott, who was positioned near Chopin and Cardenas, saw Vela holding a pistol in both hands with his arms extended in an aggressive posture, the red laser moving as Vela moved the pistol. (Scott Aff., Dkt. 46-1, at 169–74). Chopin saw Vela move in front of the window to his apartment and fired one shot. (Chopin Aff., Dkt. 46-1, at 128, 133).

Westbrook approached to investigate and saw blood on the floor inside Vela's apartment, but he did not see Vela. (Westbrook Statement, Dkt. 46-1, at 60). Vela then appeared from the kitchen and ran toward the glass door. (Westbrook Aff., Dkt. 46-1, at 74). After the officers resumed cover, Vela was heard chambering ammunition into his gun, and a shot was fired from within the apartment. (*Id.* at 75; Poswalk Aff., Dkt. 46-1, at 105; DMAV Ricker, Exh. 18, Dkt. 46-1, at 24:00, 25:30). The officers all remained in their positions (*See* DMAV Ricker, Exh. 18, Dkt. 46-1, at 25:00–28:00). They also heard Vela moving furniture inside the apartment and the sound of Vela kicking the front door. (Westbrook Aff., Dkt. 46-1, at 75; DMAV Ricker, Exh. 18, Dkt. 46-1, at 28:00).

About nine minutes after the first shot was fired, Vela was seen moving in front of the window again. (DMAV Ricker, Exh. 18, Dkt. 46-1, at 28:16; Chopin Aff., Dkt. 46-1, at 135;

6

Cardenas Aff., Dkt. 46-1, at 152). Ricker again saw the laser on the wall outside the apartment. (Ricker Statement, Dkt. 46-1, at 55). Chopin and Cardenas each fired a shot at Vela. (Chopin Aff., Dkt. 46-1, at 135; Cardenas Aff., Dkt. 46-1, at 152, 159; DMAV Ricker, Exh. 18, Dkt. 46-1, at 28:16–28:28). Vela was then heard screaming for help from the apartment. (DMAV Ricker, Exh. 18, Dkt. 46-1, at 29:15). The officers gave verbal commands; Vela complied, opened the door, and crawled out of his apartment. (*Id.*). Officers found a black Glock .40 pistol, with its slide appearing partially to the rear, and two loaded magazines inside the apartment. (Ricker Statement, Dkt. 46-1, at 56; Hancock Statement, Dkt. 46-1, at 92; Poswalk Statement, Dkt. 46-1, at 95).

Vela was treated for a bullet wounds to his shoulder and later indicted by a grand jury for aggravated assault against a public servant—threaten with deadly weapon. (Indictment, Dkt. 46-1, at 199). Vela was found not guilty by a Travis County jury on March 4, 2015.

## IV. DISCUSSION

Vela argues that the Officers' use of deadly force against him was excessive and in violation of his Fourth Amendment Rights for two reasons. First, the officers failed to announce themselves, give notice of their presence, or otherwise order Vela to cooperate. (Resp., Dkt. 47, at 14, 15–16). Second, Vela says that he was not a threat; he never pointed the gun at any officer, and if he did, he was not an immediate threat at each time the Officers fired their weapons. (*Id.* at 10–12, 13–18). Thus, according to Vela, the use of deadly force was not justified. (*Id.* at 16–17). The Officers assert that they are entitled to qualified immunity with respect to Vela's excessive-force claim. According to the Officers, the undisputed facts show that a reasonable officer would have perceived Vela to be a threat each time force was used. (Reply, Dkt. 56, at 2–3).

Whether an official is entitled to qualified immunity is a two-step inquiry. In the context of a motion for summary judgment, the Court must determine (1) whether the plaintiff has shown a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of

7

the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court has discretion to decide which of the two steps to address first. *Id.* at 236. If there is no constitutional violation, the officer is entitled to qualified immunity from suit. *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003). The Fourth Amendment creates a "right to be free from excessive force during a seizure." *Poole*, 691 F.3d at 627. To prove an excessive force claim, Vela must show that "in addition to being seized, he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 846 (5th Cir. 2009) (citation and quotation marks omitted).

The dispute in this case is best summarized as whether Vela posed a sufficient threat to the officers at the scene to render the Officers' use of force reasonable. As explained below, the Offcers are entitled to summary judgment on Vela's excessive-force claim.

### A. Improper Notice & Announcement

Vela's first argument is that he did not receive adequate notice that Austin police officers were at his front door. (Resp., Dkt. 47, at 15). According to Vela, no officer at his door actually announced himself as required by Austin Police Policy 200 and the Texas Penal Code § 9.51. (*Id.*).

Both the Austin Police Department policies and the Texas Penal Code provide guidance to police officers on when an officer's use of force is justified. Relevant here, the Texas Penal Code provides that "before using force, the actor manifests his purpose to arrest or search and identifies himself as a peace officer . . . unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known." *Id.* § 9.51(a). Consistent with the Texas Penal Code, Austin Police Department Policies require officers to "identify themselves as a peace officer before using force" when "it is not already reasonably known by the subject to be searched or arrested, or it is not reasonably" practicable to do so. Austin Police Dep't Policy Manual § 200.2.3,

8

*available at*

https://www.austintexas.gov/sites/default/files/files/Current_APD_Policy_Manual_2017-1.5_issued_7-20-2017.pdf.

Relying on these provisions, Vela says that because he never received notice, and the officers never identified themselves, the use of force was not justified and therefore excessive. (Resp., Dkt. 47, at 15). Relying on *Rainwater v. Sikes*, No. 4:17-CV-967-A, 2018 WL 1916566 (N.D. Tex. Apr. 23, 2018), Vela argues that the failure to announce is a significant factor in denying qualified immunity. (Resp., Dkt. 47, at 15).

But the officers *did* provide notice to Vela. Several officers arrived at Vela's apartment to conduct a welfare check and knocked on his door. After receiving no response, the officers at the scene requested that the dispatch operator attempt to contact Vela by calling him. The dispatch operator did so, made contact with Vela, and notified him that APD officers were at his front door to check on him at the request of a friend. Vela responded: "Where are they at? Where are you guys? You guys are coming to get me. You guys are coming to get me." (APD Call Recording, Dkt. 46-1, Exh. 4; *see also* Vela Dep., Dkt. 46-1, at 23–24). The dispatch operator then communicated Vela's response to the officers at the scene shortly before they spotted Vela walking toward the door with a handgun. Officers at the scene knew that the operator had spoken with Vela, so they did not question Vela's awareness of the police at the apartment complex. (*See, e.g.*, Westbrook Statement, Dkt. 46-1, at 60).

Comparatively, this case is a far cry from the facts of *Rainwater v. Sikes*. Like this case, *Rainwater* concerns officers asserting qualified immunity in a case bringing excessive force claims. 2018 WL 1916566, at *1. In *Rainwater*, the plaintiff's dogs began barking late at night, and he went to investigate the cause of the disturbance. *Id.* He stepped onto his front porch with a gun pointed at the ground, but he did not see anything outside. *Id.* He then turned to go back inside, when he was

shot twice in the back. *Id.* Unbeknownst to the plaintiff, police officers had formed a perimeter around his house and approached in an effort to conceal their presence from him. *Id.*

There are significant differences between *Rainwater* and this case. In *Rainwater*, the Court was examining whether the officers were entitled to qualified immunity based on the allegations in the plaintiff's complaint at the motion to dismiss stage. *Id.* at *4. But here, the Court is examining the record evidence in response to the Officers' Motion for Summary Judgment. Next, the officers in *Rainwater* "*never* notified the plaintiff of their presence." *Id.* But here, the officers did not attempt to conceal their actions; they attempted to contact Vela by phone. Finally, the *Rainwater* court found that the plaintiff did not pose a threat to police—he was unaware that officers were outside his house, and he stepped onto his porch with his gun pointed at the ground and turned to go back inside. *Id.* ("And the facts alleged show that plaintiff posed no threat to any person at the time he was shot. Rather, plaintiff was turning to go back inside his house. He was not aware of the location of the officers, much less their presence."). Vela, on the other hand, *was* aware that officers were outside his apartment, yet he grabbed his pistol and approached his front door anyway.[2]

Vela disputes that the phone call he received from the dispatch operator was sufficient to notify him of the officers' presence. Vela contends that "for notice to be effective, it must be adequately communicated to the subject and correctly received by the subject." (Resp., Dkt. 47, at 15). He argues that the "single almost off-hand mention without special emphasis that officers are at the door, stated to a person who is not in his right mind[,] is hardly effective notice." (*Id.*).

The Court disagrees. First, Vela does not cite any authority that requires that notice correctly be received to be effective. Even the APD policies and the Texas Penal Code only go so far as to provide that force is justified if an officer "reasonably believes" that his purpose and identity are

---

[2] Vela disputes whether he carried his gun in a threatening manner. The Court addresses Vela's argument that he did not pose a threat to officers *infra* Section IV.B. For now, it is enough to note that unlike the plaintiff in *Rainwater*, Vela was investigating the known presence of officers at his door with a firearm.

10

already known. Here, the officers specifically attempted to alert Vela to the presence of officers by having the dispatch operator make contact with him by phone. A reasonable officer could conclude from the dispatcher's response that Vela recognized their presence. Second, even if actual notice were required, the undisputed facts show that Vela had it here. Vela's response to dispatcher communicated that he understood officers were outside his apartment. And Vela's brother, Jason, testified that Vela called him and told him that "police are coming," and Vela asked Jason to "tell the police to go away." (Jason Vela Statement, Dkt. 46-1, at 193). Thus, the Court finds that the officers attempted to announce themselves to Vela, and Vela had actual notice that police officers were outside his apartment based on the phone call he received from the dispatcher.

## B. Whether Vela Posed a Threat

Next, Vela argues that the Officers' use of force was not reasonable because he never held his gun in a threatening manner, and if he did, the threat had dissipated by the time the Officers shot him. (Resp., Dkt. 47, at 13–15, 16–17). On the other hand, the Officers argue that the use of force was reasonable because Vela posed an imminent threat of harm to others at the scene. (Reply, Dkt. 56, at 3–4).

Whether the force used was excessive or unreasonable depends on the "totality of the circumstances." *Tennessee v. Garner,* 471 U.S. 1, 8–9 (1985). In making this determination, the Court has been directed to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Poole,* 691 F.3d at 627–28 (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Mercantel,* 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham,* 490 U.S.at 396). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

The reasonableness of an officer's conduct is judged objectively without reference to the officer's intent or motivation. *Graham*, 490 U.S. at 397. Similarly, the plaintiff's "actual intention – if indeed that could be discerned – is not the test. The question is whether in view of the [plaintiff's conduct], [the officer] was objectively reasonable in believing [the plaintiff] posed a threat of serious harm." *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009). Courts must look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. And courts must also account for the difficult and often split-second decisions that police officers must make in carrying out their duties. *Id.* at 396–97. The "[u]se of deadly force is not unreasonable when an officer would have reason to believe the suspect poses a threat of serious harm to the officer or others." *Mace v. City of Palestine,* 333 F.3d 621, 624 (5th Cir. 2003); *see also Garner,* 471 U.S. at 11–12.

Vela says that carrying a firearm in itself does not establish that an individual poses a threat. (Resp., Dkt. 47, at 10, 17). And according to Vela, he never held the weapon in a threatening manner. (*Id.* at 10). Rather, he carried his gun in the "low ready" position, pointed down between a 20 and 30 degree angle, during the incident. (*Id.* at 17; Vela Dep., Dkt. 46-1, at 25–26).

It is true that "[m]erely having a gun in one's hand does not mean *per se* that one is dangerous." *Graves v. Zachary*, 277 F. App'x 344, 348 (5th Cir. 2008). But at the same time, an officer need not "wait until an armed individual shoots to confirm that a serious threat of harm exists." *Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) (quoting *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)). Instead, an officer must have probable cause to believe that when deadly force is used, the suspect posed a serious threat of harm. *Id.* at 129 (quoting *Garner*, 471 U.S. at 11). This depends

12

on whether the Officers were objectively reasonable in believing that Vela posed a threat of serious harm. *Manis*, 585 F.3d at 845.

Vela says that there is a dispute of material fact[3] as to whether he pointed his gun at any officer during the incident. (Resp., Dkt. 47, at 16). Vela contends that he held the pistol in one hand and the laser pointer in the other and that he never pointed the gun at any individual. (*Id.* at 17–18; Vela Dep., Dkt. 46-1, at 25–26). Vela contends that he never attached the laser sight to the pistol that night. (Vela Dep., Dkt. 50, Exh. 3, at 54). And according to Vela, the officer accounts of when and how the gun was pointed are inconsistent. (Resp., Dkt. 47, at 10). For example, Vela says that Westbrook admitted he never saw the gun pointed at him or any other individual. (*Id.*). And Vela argues that neither Officer Chopin nor Officer Cardenas claim to have ever seen him targeting them or any other individual when they shot him. (*Id.*).

Vela's account is inconsistent with the undisputed record evidence.[4] Unlike *Rainwater*, there is ample evidence, including video evidence, to support a reasonable officer's perception that Vela posed an immediate threat not only to the officers, but to the other inhabitants at the apartment complex. It is undisputed that Vela was armed with a pistol and a laser sight for the pistol, and that he walked toward the sliding glass door with his gun "at the ready," "pointed down between a 20- and 30-degree angle." (Vela Dep., Dkt. 46-1, at 20; Vela Dep., Dkt. 50, Exh. 3, at 52–53). Vela

---

[3] Throughout Vela's response to the Officer's Motion for Summary Judgment, Vela argues that genuine issues of material fact preclude summary judgment and qualified immunity, but Vela has not cited any particular part of the record in making his argument. (*See, e.g.*, Resp., Dkt. 47, at 15–18). The record currently before the Court is voluminous. Arguably, Vela has failed to show a genuine issue of material fact by failing to cite to specific portions the record to support his arguments. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record."). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Adams*, 465 F.3d at 164.

[4] Much of Vela's argument also asks the Court to see the event from his perspective rather than that of a reasonable officer. For example, Vela argues that "Gene's belief that he could be in his own home and hold his gun in his hand was a reasonable belief considering that the officer[s] outside" were not visible to him. (Resp., Dkt. 47, at 13). Vela particularly also emphasizes that he was experiencing a PTSD episode, (*see id.* at 3; Rini Aff., Dkt. 47, Exh. 2, at 2), and he offers evidence about how the situation affected his mental state, (Parker Aff., Dkt. 47, Exh. 1). But the qualified immunity analysis focuses on the officer's perspective, not the plaintiff's. *See Hale v. City of Biloxi, Miss.*, 731 F. App'x 259, 263–64 (5th Cir. 2018).

admits that he shined his laser sight out of the glass door.[5] (Vela Dep., Dkt. 46-1, at 20, 25–26). And officers testified that they saw the red dot from the laser on other officers at the scene. (*See, e.g.*, Westbrook Statement, Dkt. 46-1, at 59–60). Whether or not Vela held the laser in the same hand as his pistol is immaterial. Officers at the scene, including Chopin and Cardenas, saw the laser repeatedly pointed in the direction of officers. (*See* Chopin Aff., Dkt. 46-1, at 127–28; Westbrook Statement, Dkt. 46-1, at 59; Poswalk Aff., Dkt. 46-1, at 105 ("I could still see the laser and it crossed over [Sergeant Westbrook's] body a couple of times."); Ricker Statement, Dkt. 46-1, at 54). Another officer, Officer Scott, saw Vela holding the pistol with arms extended in an aggressive posture and saw the laser moving as Vela moved the pistol. (Scott Statement, Dkt. 46-1, at 162; Scott Aff., Dkt. 46-1, at 169, 171–72). Based on the knowledge the officers had at the time, pointing the laser itself supported a reasonable belief that Vela posed a serious threat.

After arriving at the scene, Chopin and Cardenas each saw the laser pointed not only in the direction of officers but also toward Chopin and Cardenas themselves. (Chopin Aff., Dkt. 46-1, at 128–33; Cardenas Aff., Dkt. 46-1, at 154–56). Leading up to the shooting, Chopin and Cardenas heard other officers say on the radio that Vela had a gun with a laser pointer and that Vela was "pointing the gun" and the laser at officers. (Chopin Aff., Dkt. 46-1, at 127–28; Cardenas Aff., Dkt. 46-1, at 150, 155; Ricker Statement, Dkt. 46-1, at 54). A review of the dashboard videos supports the Officers' account. Westbrook's patrol car dashboard video shows the laser sweeping across the car and wall where Chopin and Cardenas were positioned. (DMAV Westbrook, Exh. 17, Dkt. 46-1, at 13:50). And Ricker's patrol car dashboard video shows the laser on the wall and ceiling outside the sliding glass door to Vela's apartment. (*See, e.g.*, DMAV Ricker, Exh. 18, at 11:09). The video also

---

[5] Vela's only explanation for why he shined the laser outside his apartment is that he must have thought it was a flashlight. (*See* Vela Dep., Dkt. 46-1, at 27, 29). This may explain Vela's behavior, but once again, this mistaken belief is not material to the reasonableness analysis. Other officers at the scene radioed that Vela "had a pistol with a laser pointer on it." (*See* DMAV Ricker, Dkt. 46-1, Exh. 18, at 9:30). The Court must determine whether a reasonable officer at the scene would have perceived a gun with a laser sight pointed at police officers to be a serious threat.

14

shows a figure appear in a window several times with arms extended. (*See id.* at 8:02–8:50). Under the circumstances, a reasonable officer in Chopin's and Cardenas's position would interpret Vela's behavior as an imminent threat to the officers at the scene.

Vela also argues that even if he posed a threat of serious harm to the officers, the threat had dissipated by the time the Officers fired at Vela. (Resp., Dkt. 47, at 9). According to Vela, the threat determination is measured by "immediacy" and "if an officer uses deadly force at any moment other than when the threat was immediate, then the officer has used excessive force *per se*." (*Id.*). Vela notes that some officers state specifically that they did not see Vela point his gun when he was shot. (*Id.* at 18).

Vela's focus on the timing of the shooting ignores how the event unfolded over the course of thirty minutes. Officers Chopin and Cardenas saw Vela actively targeting officers, specifically Westbrook, when they fired their weapons. (Reply, Dkt. 56, at 4; Chopin Aff., Dkt. 46-1, at 127–28). Both officers heard over the radio that Vela was armed with a pistol and that he was pointing the gun at officers. Chopin Aff. Dkt. 46-1, at 132; Cardenas Aff., Dkt. 46-1,a t 150). They each saw the laser pointing out of the glass door and across the street. (Chopin Aff. Dkt. 46-1, at 128–34; Cardenas Aff., Dkt. 46-1, at 154–56; *see also* DMAV Westbrook, Exh. 17, Dkt. 46-1, at 13:50). Scott, who was positioned near Chopin and Cardenas, saw Vela holding a pistol in both hands with his arms extended in an aggressive posture, the red laser moving as Vela moved the pistol. (Scott Aff., Dkt. 46-1, at 169–74). Just before he fired his first shot, Chopin saw Vela stand in front of the glass door, raise the gun to chest level, and point it out the glass door. (Chopin Aff., Dkt. 46-1, at 133). After Chopin's first shot, officers heard Vela loading a magazine and fire a shot within the apartment. (*Id.* at 129, 135; Cardenas Aff., Dkt. 46-1, at 151–52; Westbrook Aff., Dkt. 46-1, at 75). Officers then began to evacuate nearby residents. (*See* DMAV Ricker, Dkt. 46-1, Exh. 18, at 13:13). Chopin and Cardenas then saw Vela move in front of the glass door and begin to raise his gun

15

before again firing their weapons. (Chopin Aff., Dkt. 46-1, at 129, 135; Cardenas Aff., Dkt. 46-1, at 151–52).

In evaluating the Officers' decisions to use force, the Court must consider that officers must make decisions in "tense, uncertain, and rapidly evolving" circumstances such as this. *Graham*, 490 U.S. at 397. Of course, the Court could imagine some alternative means that would obviate the need to use force in this situation, but that is not a question left for the Court to decide on qualified immunity. *See Ramirez*, 542 F.3d at 129–30 (quoting *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985)) ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."). Chopin and Cardenas were confronted with an individual who, after hearing on the radio and witnessing themselves, had pointed a gun and laser sight aggressively toward officers and out the glass door, leading them to believe that Vela was targeting officers. The evidence supports finding that Vela had pointed his weapon at officers repeatedly over the course of the incident, and that the officers reasonably believed him to be a threat. Accordingly, Chopin's and Cardenas's actions were reasonable.

## V. EVIDENTIARY OBJECTIONS

Vela and the Officers each object to various pieces of evidence submitted by the opposing party. Vela first objects to the affidavit of Karen Emerson, Vela's mother, because she is deceased and unavailable to give testimony. Next, Vela objects to a screenshot of a cellphone text message chain between Vela and his brother, Jason, because it is "presented without context." (Resp., Dkt. 47, at 19; *see* Texts Between Gene Vela and Jason Vela, Dkt. 46-1, at 197). The Court does not rely on the Emerson affidavit or the cellphone screenshot in reaching its conclusion on Vela's excessive-force claims. Indeed, the Officers do not appear to offer any affidavit by Karen Emerson in support of their motion for summary judgment. (*See* Mot., Dkt. 46, at 2). Accordingly, the Court need not reach the question of whether this evidence is admissible.

The Officers similarly object to three affidavits offered by Vela: (1) the affidavit of Dr. George Parker, a forensic psychologist, (Parker Aff., Dkt. 47, Exh. 1); (2) the affidavit of Gary Rini, an expert in police practices and procedures, (Rini Aff., Dkt. 47, Exh. 2); and (3) the affidavit of Vela, (Vela Aff., Dkt. 47, Exh. 12). These three affidavits, however, do not affect the Court's conclusion that the Officers are entitled to summary judgment because they fail to overcome other evidence in the record showing that a reasonable officer would perceive Vela's action as a serious threat of bodily harm to others at the scene. Most importantly, both the Parker and the Rini affidavits focus on Vela's perspective rather than a reasonable officer's. Vela's affidavit simply raises the same evidentiary objections to statements by Emerson and the screenshot of text messages. Defendants have not included any statement by Emerson in their motion for summary judgment and, as already stated, the Court does not rely on the cellphone screenshot to reach its conclusion that a reasonable officer would have perceived Vela to pose a serious threat of bodily harm to officers at the scene.

## VI. CONCLUSION

**IT IS ORDERED** that the Officers' Motion for Summary Judgment, (Dkt. 46), is **GRANTED**.

**SIGNED** on August 26, 2019.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE